Joseph H. Harrington  
Acting United States Attorney  
Eastern District of Washington  
Richard R. Barker  
Alison L. Gregoire  
Assistant United States Attorneys  
Post Office Box 1494  
Spokane, WA 99210-1494  
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MADDESYN DANIELLE GEORGE,<br><br>Defendant. | 2:20-CR-153-RMP-1<br><br>UNITED STATES' MOTION IN LIMINE REGARDING AN ASSERTION OF PROVOCATION, JUSTIFICATION, AND SELF-DEFENSE<br><br>Pretrial Conference Scheduled on July 27, 2021, at 9:30 a.m. |

Plaintiff, the United States of America, by and through Joseph H. Harrington, Acting United States Attorney for the Eastern District of Washington, Richard R. Barker, and Alison L. Gregoire, Assistant United States Attorneys, respectfully submits this motion in limine requesting that the Court issue an order addressing whether and to what extent the parties may allude to self-defense in voir dire, opening statements, and in the United States' opening case.

## BACKGROUND

Defendant is charged by way of a Superseding Indictment with seven counts: (1) Robbery Affecting Commerce, in violation of 18 U.S.C. § 1951; (2) Possession of a Stolen Firearm, in violation of 18 U.S.C. § 922(j); (3) Possession with Intent to Distribute 5 Grams or More of Actual (Pure) Methamphetamine, in violation of 21

MOTION IN LIMINE                   1

U.S.C. § 841; (4) Second Degree Murder in Indian Country, in violation of 18 U.S.C. §§1111(a), 1153; (5) Assault with a Dangerous Weapon in Indian Country, in violation of 18 U.S.C. §§ 113(a)(3), 1153; (6) Discharging and Using a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c); and, (7) Murder resulting from Discharging and Using a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. 924(j)(1). ECF No. 32.

At trial, the United States anticipates that the evidence will establish the following evidence. Defendant robbed the decedent, Kristopher Paul Graber, of approximately $6,100 in cash, about 47 grams of methamphetamine, and a semi-automatic pistol on July 11, 2020. The next day, July 12, 2020, when Mr. Graber attempted to reclaim his property, Defendant shot Mr. Graber in the chest, killing him almost instantly, from inside a Mercedes sedan. The fatal gunshot went through the passenger-side window, breaking the glass. At the time of his shooting death, Mr. Graber was unarmed.

In a custodial interview that occurred shortly after the shooting, Defendant waived her Miranda rights and agreed to speak with police. *See* Exhibit 1 (Transcript and recording of Defendant's custodial statement (available at Bates 00000629)). In the interview, Defendant denied knowing anything about how Mr. Graber was shot. After a break, Defendant indicated she had been staying with Kris Graber. Defendant explained that Mr. Graber rubbed his nosed against her leg while standing behind her and grabbed her buttocks. According to Defendant, Mr. Graber put his nose by her buttocks, and when she tried to sit up, he pulled her down and laid on top of her while she was on her side. She then said, "Just get the fuck off of me." Defendant claimed that Mr. Graber pulled out a gun and said, "This will make you stay [laughing noise]." Defendant added, Mr. Graber appeared to be "joking about it." According to Defendant, she responded to Mr. Graber pulling out the gun,

"Yeah, right, you wouldn't." She explained, "You know, I was like he was just joking, you know."

In her statement to law enforcement, Defendant explained that Mr. Graber had a vibrator and was saying, "Here, just try it, just try it." She added, "You know, and I'm trying to be cool with the situation, and I'm like, 'No, and I can't even feel shit anyways. I just had a C-section,' you know." Defendant claimed that Mr. Graber was insistent: "Come on, just try it." To this, Defendant responded, "No," but Mr. Graber allegedly insisted. First, he pressed the vibrator over Defendant's crotch, over her clothing. She then responded, "See, I told you I didn't feel shit anyways, you know." At this point, Defendant stated that Mr. Graber unbuttoned her pants and put the vibrator "down there." She told him to stop and that it hurt, and he responded that she liked it. According to Defendant, this went on for about forty-five minutes until Defendant convinced Mr. Graber that she was hungry. Mr. Graber then got up and cooked breakfast for Defendant.

Defendant explained, after eating breakfast, a "couple people showed up," but then left. A maid then came over for about an hour, but also left. Defendant was doing her hair and then told Mr. Graber she was, "[P]robably going to head out or try to if I can get a ride." Mr. Graber asked why she was not laying with him and pulled her toward him, where she laid until he fell asleep. At that point, Defendant, "grabbed this gun and I put on [her] shoes and then walked out the door." According to Defendant, she took "maybe a little bit of dope" from Mr. Graber, but she did not take any money.

George would later explain she was in David Priest's Mercedes sedan, at his house, behind a locked door with a window cracked "not very much," when Mr. Graber showed up demanding his stuff back. She picked the stolen gun off the floor and shot Mr. Graber.

# LAW AND ARGUMENT

As set forth herein, the parties anticipate that Defendant may assert at trial that she acted in self-defense or was otherwise justified when she shot Mr. Graber. This defense appears to be based on Defendant's own statements of what happened in the twenty-four hours leading up to the shooting. However, Because it is not clear what evidence may or may not be offered in support of her self-defense theory, especially given that any such theory would be based exclusively on Defendant's own testimony, this Court should satisfy itself that any such theory will be based on admissible evidence and passes legal muster. This is appropriate to ensure that the jury does not become privy to a possible theory that may not have any basis in the evidence ultimately presented at trial.

### I. Presentation of Evidence & Argument

The conduct of a trial and its direction are subject to the sound discretion of this Court. Accordingly, district judges have discretion to limit the scope of the trial and to exclude "refer[ences] to matters that are not to be presented as evidence." *United States v. Taren-Palma*, 997 F.2d 525, 532 (9th Cir. 1993), *overruled on other grounds by United States v. Shabani*, 513 U.S. 10 (1994). Similarly, trial courts have discretion to limit references in an opening statement to a possible defense until the defendant makes a sufficient showing or proffer of evidence. *United States v. Blasingame*, 197 F.3d 271, 280 (7th Cir. 1999). As the Supreme Court has explained,

> The requirement of a threshold showing on the part of those who assert an affirmative defense to a crime is by no means a derogation of the importance of the jury as a judge of credibility. Nor is it based on any distrust of the jury's ability to separate fact from fiction. On the contrary, it is a testament to the importance of trial by jury and the need to husband the resources necessary for that process by limiting evidence in a trial to that directed at the elements of the crime or at affirmative defenses.

*United States v. Bailey*, 444 U.S. 394, 416 (1980). Consistent with *Bailey*, "[a] district court may properly deny a defendant the opportunity to introduce evidence supporting an affirmative defense by granting a pre-trial motion in limine, so long as the facts proffered by the defendant to support the defense are insufficient as a matter of law to meet the minimum standard as to each of the elements of that defense." *United States v. Sahakian*, 453 F.3d 905, 909 (7th Cir. 2006).

In a similar vein, "[t]he scope and extent of the defendant's opening statement rests largely in the discretion of the trial court." *United States v. Freeman*, 514 F.2d 1184, 1192 (10th Cir.1975); *see also Taren-Palma*, 997 F.2d at 532 (explaining that opening statements, "like closing, should not refer to matters that are not to be presented as evidence"); *United States v. Wood*, 550 F.2d 435, 440 (9th Cir. 1976) ("The scope of examination is a matter of discretion for the trial court."). The reasons for precluding the parties from presenting legally or factually deficient theories to the jury is clear: The possibility that introduction of argument and evidence concerning a legally unsustainable theory based on actual evidence that is likely to be admitted at trial could result in juror confusion, an unreasonable jury verdict, or worse, jury nullification, is one that trial courts must diligently guard against. *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996); *United States v. Kleinman*, 880 F.3d 1020, 1033 (9th Cir. 2017) (explaining that courts have "the duty to forestall or prevent nullification") (internal brackets omitted).

In this case, the defense theory appears to be that Defendant shot Mr. Graber because, according to her, Mr. Graber assaulted her with a vibrator a day or more prior to the shooting. Defendant further alleges that Mr. Graber may have been trying

to reach into the Mercedes[1] to either unlock the door, grab Defendant, or retrieve a backpack that was on Defendant's lap.

To the extent such evidence is sufficient to support a theory of self-defense or justification – which the United States maintains such evidence may not be legally sufficient in light of evidence that Defendant shot Mr. Graber after robbing him as detailed herein – the sole source of such evidence would be Defendant's own testimony or statements. Unless and until the Court is satisfied that relevant evidence to support self-defense *will in fact* be introduced at trial,[2] the Court should consider limiting counsel from alluding to an alleged assault with a vibrator during opening

---

[1] The United States anticipates that evidence at trial will be that the window was open between approximately 1.2 – 1.42 inches when Defendant shot Mr. Graber from behind the locked door. *See* Exhibit 2 (Bates 00000555). There is no evidence that Mr. Graber could have reached into the car at the time of the shooting and somehow strike Defendant. There also is no evidence that Defendant was in any way physical harmed during the interaction immediately prior to the shooting.

[2] To the extent that such a ruling would require certain witnesses to be subject to recall, the United States will ensure that its witnesses are available for recall as appropriate. The United States appreciates it is within the Court's discretion to determine whether Defendant may open on her justification and/or self-defense theory. If, however, Defendant never introduces admissible evidence to support her a justification and/or self-defense theory – i.e., the alleged assault with a vibrator – the United State may have no choice but to seek a mistrial in a case. Notably, Defendant's decision whether to testify at trial is personal and she should not be compelled to make a decision as to whether or not to testify in advance of trial. *See Rock v. Arkansas*, 483 U.S. 44, 51–53 (1987).

statements. The Court should also limit questioning of witnesses about Defendant's own self-serving statements[3] about the purported assault.

## II. Defendant's Claim that She was Assaulted Is Insufficient as a Matter of Law to Establish that She Acted in Heat of Passion or Self-Defense.

In this case, the Defense may seek to assert in her opening statement that Defendant acted in heat of passion or self-defense when she shot and killed Mr. Graber approximately one to three days[4] after he purportedly assaulted Defendant with a vibrator. Prior to allowing argument or questioning regarding the alleged prior assault, the Court should ascertain whether there is likely to be admissible evidence of the assault at trial.

### (a) *Heat of Passion*

"When a defendant charged with murder introduces evidence of sudden quarrel or heat of passion, the evidence acts in the nature of a defense to the murder charge" – reducing murder to voluntary manslaughter. *United States v. Quintero*, 21 F.3d 885, 890 (9th Cir. 1994). "Once such evidence is raised, the burden is on the government to prove . . . the absence of sudden quarrel or heat of passion before a conviction for murder can be sustained." *Id.* The Ninth Circuit has explained that "heat of passion may be provided by fear, rage, anger or terror. Provocation, in order to be adequate must be such as might arouse a reasonable and ordinary person to kill

---

[3] The United States is also filing a Motion in Limine regarding Character Evidence, which also addresses whether certain of Mr. Graber's prior bad acts would be admissible absent testimony regarding Defendant's knowledge of those prior acts.

[4] Defendant made inconsistent statements regarding the timing of the alleged assault, including telling law enforcement that the assault occurred the day prior to the murder. In Defendant's statement to David Priest, she indicated the alleged assault occurred a few days before the shooting. *See* Bates 50000003.21.

someone." Ninth Cir. Crim. Model Jury Instr. 8.109 (Voluntary Manslaughter); *see also United States v. Roston*, 986 F.2d 1287, 1291 (9th Cir. 1993). A heat of passion defense fails in this case for two reasons: (1) Defendant cannot claim provocation because she robbed Mr. Graber and shot him when she attempted to reclaim his property; (2) dissipation of any alleged provocation due to the amount of time between the alleged assault and the shooting.

*(1) Defendant Cannot Claim Provocation*

Any potential provocation defense is negated here because Defendant robbed her victim before shooting him when he attempted to get his property back. In *Saunders v. Folk*, the district court rejected the heat of passion defense where the defendant robbed a victim who pursued the defendant after a robbery:

> Here, evidence that the victim chased, or was perceived to be chasing, the robber is a predictable response to the commission of a robbery that does not amount to legally adequate provocation for a heat of passion defense. The victim allegedly chasing the robber also would not support self-defense or unreasonable self-defense because neither doctrine applies if the defendant's "own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified."

*See* 2019 WL 570750, at *3 (N.D. Cal. Feb. 12, 2019) (quoting *People v. Valencia*, 43 Cal. 4th 268, 288 (Cal. 2008)).

The evidence at trial in this case is anticipated to be that Defendant robbed Mr. Graber – taking approximately $6,100, drugs, and his gun. That Mr. Graber might pursue the Defendant and seek to get his property back was expected and precludes Defendant from claiming that she acted in heat of passion. As in *Folk*, Defendant initiated the physical attack by robbing Mr. Graber and pulling a gun on him when he asked for his property back. Accordingly, no heat-of-passion defense would be available on the current record.

*(2) Dissipation of Time*

If the robbery were not enough to negate a heat of passion defense, the amount of time between the alleged assault with vibrator and the shooting further demonstrates that a provocation defense is unavailable. "It is well established that if the defendant had enough time between the provocation and the killing to reflect on his or her intended course of action, 'then the mere fact of passion would not reduce the crime below murder.'" *United States v. Bordeaux*, 980 F.2d 534, 537-38 (8th Cir.1992) (quoting *Collins v. United States*, 150 U.S. 62, 65 (1893)). In fact, courts have rejected a provocation or heat of passion defense on circumstances similar to the anticipated evidence here:

> In this case, the time between [the defendant's] emotional response to his father's injuries and the stabbing mitigates against a viable provocation defense. After seeing his wounded father, [the defendant] set out to find [the victim]. Once [the defendant] arrived, he and [the victim] spoke before engaging in a fight. Driving to a different location and then verbally confronting an intended victim for some time before assaulting him is inconsistent with the claim that [the defendant] acted impulsively without any self-control.

*United States v. Milk*, 447 F.3d 593, 599–600 (8th Cir. 2006). Other courts have reached the same conclusion on similar facts. *See, e.g.*, *Washington v. Indiana*, 808 N.E.2d 617 (Ind. 2004) (holding that no instruction for heat of passion was appropriate where the defendant first saw the victim together with another man in the evening, but attacked her several hours later, after he obtained a knife and waited for the victim to return); *Brown v. Indiana*, 751 N.E.2d 664 (Ind. 2001) (a defendant had time to cool off and did not act under sudden heat when he shot and killed the victim, as several hours had passed between the victim's rude conduct towards the defendant and the defendant's shooting of the victim); *Merritt v. Georgia*, 851 S.E.2d 555 (Ga. 2020) (no heat of passion where the defendant shot his victim hours

after the purported altercation, providing ample time to cool any passions heated by an earlier altercation).

The amount of time in this case between the alleged encounter – the purported assault with a vibrator and the shooting – further demonstrates that a provocation defense is not available. After the purported assault, Defendant stayed for breakfast with Mr. Graber, stayed while people, to include a maid stopped by, and observed the victim paint a mirror. Hours later, Defendant took the victim's money, drugs, and firearm. She then contacted a number of her friends for a ride. Once she got a ride, Defendant traveled from Omak to Nespelem, where she spent several hours with her immediate family. Defendant then traveled to Grand Coulee, Washington, where she visited a casino. The next morning, Defendant traveled with David Priest from Grand Coulee back to Omak, and then to Malott, Washington. Defendant later returned to Omak, fully aware that Mr. Graber wanted his property back, as she indicated in her interview. Once Mr. Graber arrived, he and Defendant spoke – Mr. Graber asked for his property back and Defendant refused. Accordingly, like in *Milk*, Defendant's actions of "driving to a different location and then verbally" speaking with her victim "for some time before shooting him is inconsistent with the claim that Defendant acted impulsively without any self-control." *See id.*

On this record, the evidence even viewed in the light most favorable to the Defense does not support a provocation defense. At the very least, any statement, argument or questioning regarding provocation should be precluded unless and until sufficient evidence of provocation is introduced at trial.

**(b)** *Self-Defense*

Assuming Defendant is permitted to introduce evidence of the assault with a vibrator, such evidence, without more, is not sufficient as a matter of law for a jury to acquit on the basis of self-defense. This is so for two reasons: (1) Defendant's robbery negates any right to use deadly force when Mr. Graber approached

MOTION IN LIMINE                                                    10

Defendant seeking the return of his stolen property; and (2) an assault with a vibrator does not justify the use of deadly force one to three days after the alleged assault.

### 1. Defendant Was the Initial Aggressor and Cannot Claim Self-Defense.

A person cannot support a claim of self-defense by a self-generated necessity to kill. TheNinth Circuit has explained, "One who provokes another's use of force may not assert self-defense, even if the other's use of force is unlawful." *Garcia v. United States*, 826 F.2d 806, 812 (9th Cir. 1987). As another Circuit put it:

> The right of homicidal self-defense is granted only to those free from fault in the difficulty; it is denied to slayers who incite the fatal attack, encourage the fatal quarrel or otherwise promote the necessitous occasion for taking life. The fact that the deceased struck the first blow, fired the first shot or made the first menacing gesture does not legalize the self-defense claim if in fact the claimant was the actual provoker.

*See United States v. Peterson*, 483 F.2d 1222, 1231 (D.C. Cir. 1973), *cert. denied*, 414 U.S. 1007 (1973) (footnotes omitted). Similarly, the Supreme Court has held that the law precludes self-defense when a defendant's own wrong creates the necessity for her to defend herself:

> A perfect right of self-defense can only obtain and avail where the party pleading it acted from necessity, and was wholly free from wrong or blame in occasioning or producing the necessity which required his action. If, however, he was in the wrong – if he was himself violating, or in the act of violating, the law – and, on account of his own wrong, was placed in a situation wherein it became necessary for him to defend himself against an attack made upon himself, which was superinduced or created by his own wrong, then the law justly limits his right of self-defense, and regulates it according to the magnitude of his own wrong.

*Wallace v. United States*, 162 U.S. 466, 472 (1896); *see also Harris v. United States*, 364 F.2d 701 (D.C. Cir. 1966) ("One cannot provoke a fight and then rely on a claim of self-defense when that provocation results in a counterattack, unless he has previously withdrawn from the fray and communicated this withdrawal."); *United States v. Cantrell*, 1996 WL 426884 at *2 (9th Cir. 1996) ("[A] defendant who

provokes an encounter as a result of which he finds it necessary to use force to defend himself, . . . cannot claim that he acted in self-defense.").

Further authority further establishes that an initial aggressor that robs her victim has no claim to self-defense. *See Wallace*, 162 U.S. at 471–73 (drawing on, *inter alia*, state court decisions in fashioning federal self-defense doctrine); *United States v. Desinor*, 525 F.3d 193, 199 –200 (2d Cir. 2008) ("Because the law pertaining to self-defense is a matter of federal common law, we find it appropriate to look to state court decisions for guidance.") (internal citation omitted). In this connection, Washington State law instructs that an initial aggressor has no claim to self-defense[5]:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

WPIC 16.04 (Aggressor – Defense of Self). In determining whether a person provoked a fight or violence, the Supreme Court has cautioned that a victim's statements, without more, do not constitute aggression or provocation: "Mere words . . . no matter how insulting, offensive or abusive, are not adequate to [reduce] a

---

[5] Washington State Court have cautioned that initial aggressor instructions should be used sparingly, but are appropriate in cases, such as this one, when the defendant claims self-defense, and there is evidence that the defendant's conduct or acts provoked or precipitated the incident for which self-defense is claimed. *See e.g.*, *Washington v. Riley*, 976 P.2d 624 (Wa. 1999); *see also Washington v. Wingate*, 122 P.3d 908 (2005). (re-affirming *Riley* and upholding the use of a first aggressor instruction when the evidence was disputed as to who precipitated the confrontation).

homicide although committed in passion, provoked, . . . from murder to manslaughter." *United States v. Frady*, 456 U.S. 152, 174 (1982)

Applying these principles to robbery charges – i.e., the same charge alleged in Count 1 of the Superseding Indictment in this case – courts have routinely held that "[o]ne who commits or attempts a robbery armed with deadly force, and kills the intended victim when the victim responds with force to the robbery attempt, may not avail himself of the defense of self-defense. *United States v. Thomas*, 34 F.3d 44 (2d Cir. 1994). The *Thomas* court reasoned that self-defense does not apply when defendants' "need to defend themselves arose out of their own armed aggression." *Id.*; *see also Rastafari v. Anderson*, 278 F.3d 673, 692 (7th Cir. 2002) ("self-defense could not be applied as a defense" to the crime of robbery). When "a defendant who initiates a violent crime, such as an armed robbery, that results in a fatal shooting," that defendant "may not claim self-defense absent a showing that, at the time the shooting occurred, the dangerous situation created by the initial crime had dissipated." *Desinor*, 525 F.3d at 199–200; *see also Gray v. State*, 463 P.2d 897, 909–10 (Alaska 1970) (foreclosing self-defense because defendant committed a robbery and thereby "creat[ed] a situation so fraught with peril as to preclude his claim of self-defense to any act of violence arising therefrom"). "As long as the defendant remains engaged in the perpetration or attempted perpetration of the crime that he initiated, he cannot be excused for taking the life of his antagonist to save his own. In such a case it may be rightfully and truthfully said that he brought the necessity upon himself by his own criminal conduct." *Desinor*, 525 F.3d at 199 – 200.

Related, while a defendant who commits an armed robbery has no claim to self-defense so long as risk of violence stemming from the robbery has not dissipated, the victim of a robbery is "entitled to use reasonable force to recover his property." *Trinidad v. Sherman,* No. 1:15-CV-00436, 2016 WL 3407620, at *18

(E.D. Cal. June 20, 2016). The Washington State Court of Appeals has likewise recognized that a victim of a theft has a right to pursue the theft of his or her personal property. *Washington v. Madry*, 529 P.2d 463, 464 (1974). In *Madry*, the court applied the following instruction:

> [I]t is lawful for the owner or person in possession of personal property to pursue another person who has committed a theft of his property and to recapture the things stolen. In retaking it from the person committing the theft he may use such force as may be reasonably necessary to accomplish his purpose without liability except for excess force.[6]

*Id.*[7]

As several witnesses, to include Defendant, said during interviews, Mr. Graber arrived and indicated he wanted his property back. Shannon Edwards relayed that Mr. Graber stated, "I'm just here to get what's mine, Maddy. Give me what's mine. You know it's mine. I don't want no problems, no trouble in DP's mom's driveway. Just give me my shit, or whatever you have left, and I'll go." Bates 50000004 at 29, lines 12-15. Stated otherwise, the evidence at trial will show that Defendant's alleged need to defend herself stemmed directly from her own aggression and attempt to retain the property she stole from Mr. Graber – i.e., robbing Mr. Graber of his firearm, narcotics, and money the evening prior to the shooting. Like in *Thomas*, Defendant is therefore ineligible for self-defense. In the

---

[6] If this issue is raised, the United States anticipates requesting a similar instruction in this case.

[7] Some courts have held that the victim of a robbery "has a right to use reasonable force to recover his [property] and, if actually or apparently reasonably necessary, to kill the robber in so doing." *Trinidad v. Sherman*, No. 1:15-CV-00436, 2016 WL 3407620, at *18 (E.D. Cal. June 20, 2016). The Court need not reach this issue in this case, as there is no evidence that Mr. Graber engaged in deadly force.

event the Court concludes otherwise, the United States respectfully requests an appropriately worded instruction that an initial aggressor cannot claim self-defense.

### 2. The Purported Assault One to Three Days Prior to the Shooting Did Not Justify the Use of Deadly Force

The Ninth Circuit's model jury instruction on self-defense provides that when "the defendant offers evidence of having acted in self defense," the United States "must prove beyond a reasonable doubt that the defendant did not act in reasonable self-defense." Model. Crim. Jury Inst. 6.8. Instruction 6.8 explains:

> Use of force is justified when a person reasonably believes that it is necessary for the defense of oneself or another against the immediate use of unlawful force. However, a person must use no more force than appears reasonably necessary under the circumstances.
>
> Force likely to cause death or great bodily harm[8] is justified in self-defense only if a person reasonably believes that such force is necessary to prevent death or great bodily harm.

*Id.* According to the Ninth Circuit, a defendant is entitled to the self-defense instruction so long as "there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent or of doubtful credibility." *United*

---

[8] "Great bodily harm" is not defined in the model instruction. The Ninth Circuit has drawn the definition from "serious bodily injury."

> Although we have not previously defined "great bodily harm," we find guidance in the definition of "serious bodily injury" in § 113(b)(2) (incorporating by reference the definition of "serious bodily injury" in § 1365(h)). Therefore, we hold that "great bodily harm" is any harm that involves "(A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty."

*United States v. Smith*, 561 F.3d 934, 939 (9th Cir. 2009), *as amended* (Apr. 9, 2009) (citing 18 U.S.C. §§ 113(b)(2), 1365(h)(3)).

*States v. Sanchez-Lima*, 161 F.3d 545, 549 (9th Cir. 1998). The Ninth Circuit has cautioned, however, that "the merest scintilla of evidence" is insufficient to warrant an instruction. *United States v. Jackson*, 726 F.2d 1466, 1468 (9th Cir. 1984). Rather, there must be "evidence upon which the jury could rationally sustain the defense." *Id.*

Applying the standard above, Defendant cannot establish self-defense based on the purported assault, without more. At the time of the shooting, there is no evidence that Defendant was in fear of some imminent sexual attack. Rather, according to Defendant's own statement, Mr. Graber arrived and asked, "Why did you take my shit? Why do you take my shit?" Exhibit 1 at 28. Defendant then locked the door and claims that Mr. Graber may have attempted to open the door or reach in the car. *Id.* According to Defendant, she "d[idn't] know if [Mr. Graber] was trying to open the door or grab the lock or grab me, you know, but." *Id.* When asked in her interview, "And is [Mr. Graber] trying to grab anything else or is he trying to get the door open," Defendant responded that Mr. Graber was grabbing for a backpack saying, "Well, I don't like, it was just my makeup bag or like a bag, my backpack right there on my lap." *Id.* Defendant, behind a locked door with the window nearly entirely closed, then grabbed "the gun off the floor and fucking . . . ." *Id.* at 29.

This evidence, even when viewed in the light most favorable to Defendant, falls short of reflecting an actual belief that Defendant feared for her life or that such a fear was reasonable. Similarly, Defendant's concern over her bag – which ultimately was found to contain the drugs Defendant took from Mr. Graber the day before – is not enough to demonstrate that she reasonably believed she risked death or great bodily harm when she reached for the gun on the floor, pointed it at Mr. Graber's chest, pulled the trigger, and fired the fatal gunshot that took Mr. Graber's life.

### (c) *Imperfect Self-Defense*

Depending on the evidence at trial, Defendant may seek an instruction on imperfect self-defense. The Ninth Circuit's model jury instructions do not address "imperfect self-defense." Neither 6.8 (Self-Defense) nor 8.109 (Manslaughter-Voluntary) touch on the concept of "imperfect self-defense." While the jury instructions themselves are silent, the Ninth Circuit has alluded to "imperfect self-defense," explaining that "heat of passion" is not the only condition that might reduce a murder charge to manslaughter. In *Kleeman v. United States Parole Commission*, this Circuit suggested that "extremely irrational and paranoid state of mind that severely impairs a defendant's capacity for self control" may also negate the malice attached to an intentional killing. 125 F.3d 725, 732 (9th Cir. 1997). Similarly, some commentators have suggested a defendant who creates a confrontation that led to a homicide may not escape culpability altogether but may, under certain circumstances, reduce his or her crime from murder to manslaughter. *See, e.g.*, 719 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.11(a) (1986).

In two cases, the Ninth Circuit has addressed "imperfect-self-defense" and the circumstances in which it may arise. First, in *United States v. Skinner*, the court found that an "imperfect self-defense theory" might reduce "murder to voluntary manslaughter" when a defendant engages in "excessive force" and "intentionally kill[s]" his victim. 667 F.2d 1306, 1310 (9th Cir. 1982). In *United States v. Manuel*, the Ninth Circuit cited to *Skinner*, and described "imperfect self-defense" as the "intent[ional]" use of "deadly force in the unreasonable belief that [the defendant] is in danger of death or great bodily harm." 706 F.2d at 916. Accordingly, the Ninth Circuit, then, has recognized imperfect self-defense where a defendant has an honest, but unreasonable, belief that he/she is in imminent danger of death or great bodily harm.

Based on these rulings, the difference between a complete defense, which would acquit both murder and manslaughter, and imperfect self-defense, which would reduce the offense from murder to voluntary manslaughter is this: For a complete defense, the person's actual honest beliefs about both the imminent danger and the need to use deadly force must be reasonable, whereas for imperfect self-defense, one or both of these actual beliefs are unreasonable.[9]

In this case, Defendant cannot establish that she honestly believed both that she was in imminent danger and that she needed to use deadly force. Defendant stated to police that Mr. Graber showed up and asked for his property back. She then shot him from behind a locked door with a cracked window. On this record, any claim that her life was in danger was unreasonable. Regardless, and perhaps more importantly, because Defendant had robbed Mr. Graber and engaged in force to retain his property, Defendant would have no claim to perfect or imperfect self-defense.

---

[9] The Ninth Circuit's standard for imperfect self-defense appears to be in tension with the *mens rea* (i.e., malice aforethought) required for murder. As the Circuit reiterated in *Begay v. United States*, "Malice aforethought does not require an element of willfulness if the existence of that malice is inferred from the fact that defendant acted recklessly with extreme disregard for human life." 924 F.3d 1033, 1040 (9th Cir. 2019). To reconcile the principle that recklessness is sufficient to convict on a murder charge with the principle that an "unreasonable belief" may negate malice, it must be that a defendant's unreasonable belief can be, at most, negligent, to reduce murder to manslaughter. If a defendant's honest but unreasonable belief was extremely reckless, it would be improper under *Begay* for such a belief to reduce murder to manslaughter.

## CONCLUSION

The government requests that the Court carefully consider any proffered evidence of an assault with a vibrator that allegedly occurred at least a day before Mr. Graber was shot and killed. Because any evidence relating to the alleged assault depends entirely on whether Defendant testifies, the Court should limit references in the parties' opening statements and/or in cross-examination regarding such an assault until such time of Defendant introduces admissible testimony of the assault. Unless and until Defendant has made an adequate proffer that such statements and/or questions are based on admissible evidence which will result in a self-defense or justification instruction or assert a permissible consideration for imperfect self-defense, the jury should not be privy to a possible theory that may not have any basis in the evidence ultimately admitted during the trial.

Respectfully submitted this 6th day of July, 2021.

                                                  Joseph H. Harrington
                                                  Acting United States Attorney

                                                  *s/ Richard R. Barker*
                                                  Richard R. Barker
                                                  Assistant U.S. Attorney

                                                  *s/ Alison L. Gregoire*
                                                  Alison L. Gregoire
                                                  Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2021, I electronically filed the foregoing with the clerk of the Court using the CM/ECF System, which will send notification of such filing to the following: Steve Graham.

*s/ Richard R. Barker*
Richard R. Barker
Assistant U.S. Attorney
