Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Alison L. Gregoire
Richard R. Barker
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:20-CR-00153-RMP-1 |
| Plaintiff, | UNITED STATES' SENTENCING |
| v. | MEMORANDUM |
| MADDESYN DANIELLE GEORGE, | |
| Defendant. | |

The United States of America, by and through Vanessa R. Waldref, United States Attorney for the Eastern District of Washington, Alison L. Gregoire and Richard R. Barker, Assistant United States Attorneys, submits the following sentencing memorandum. For the reasons set forth herein, the United States recommends a sentence of seventeen years of imprisonment and a lifetime term of supervised release.

### INTRODUCTION

Defendant MADDESYN DANIELLE GEORGE robbed Kristopher Paul Graber on the evening of July 11, 2020 – taking approximately $6,100, at least 47 grams of methamphetamine (just under two ounces), a wallet belonging to one of Graber's friends, and a 9mm firearm. Graber was asleep in his home when Defendant took his

property, but he awoke early the next morning and realized his property was gone. He tried for hours to get ahold of Defendant, texting her and calling her on Facebook Messenger. Defendant did not answer or return his calls. Instead, Defendant, who was in a casino more than fifty miles away, called another friend, David Priest, for a ride back to Omak. Priest told Defendant to lay low texting, "I would never sell you out."

The next day, one of Graber's friends saw Defendant at the Priest home in Omak. The friend alerted Graber and gave him a ride to the Priest home. Graber arrived during the early afternoon of July 12, 2020. He was calm. He was unarmed. The only thing in his hands was a cigarette. He asked for his property back, but Defendant, who was inside a locked car with the keys in the ignition and the window opened just a crack, refused. Graber got upset, but according to several witnesses, he was not aggressive or violent. At this point, Defendant fired a single gunshot from inside the locked vehicle, through the nearly closed window (it was cracked open about an inch), striking Graber in the heart and almost immediately taking his life.

Any number of things could have gone differently, and Graber would still be alive. Defendant could have left Graber's home on July 11, 2020 without taking his money, drugs, and firearm. She could have responded to any one of Graber's text messages or calls. At any point, she could have called Graber and returned what she stole. If she was scared, she could have arranged to have a third person give Graber what was his. When Graber arrived at the Priest home, Defendant could have asked one of her close friends and relatives who were outside – David Priest, Kevin Priest, Shannon Edwards, Martin Stanley, or Gerald Watt – to intervene. Rather than grab the gun off the floorboard, Defendant could have moved to into the driver's seat and driven away – the keys were right there.  Defendant could have handed Graber his drugs and money, "or what was left of it" and asked him to leave as he stated he would.

Instead of doing any one of these things, Defendant shot and killed an unarmed man. After the shooting, while Graber lay dying, Defendant tried to pass off the gun to

United States' Sentencing Memorandum - 2

an eyewitness and hid the stolen drugs in a nearby field. When a neighbor began calling 911, Defendant got upset. She was arrested at the scene, and initially claimed self-defense.  Later, she took responsibility, pleading guilty on July 27, 2021.

Defendant has a history of violence and drug dealing. Nothing has deterred her escalating criminal history, which has culminated in taking the life of someone she described as her "best friend."  Exhibit 1 at 13:00 (September 22, 2020 call).  While Graber was far from perfect – he was a known addict and drug dealer – his life was not beyond redemption. His friends and family knew him as kind and giving; he was someone who would provide his own coat if you needed it. Tragically, his chance for redemption is gone. Not only is Graber being described as a rapist by his "best friend," Defendant has taken away any opportunity for Graber to respond to her allegations.

## BACKGROUND

The United States continues to rely on the factual recitation, citations, and exhibits contained in the United States' Motion for an Upward Departure (ECF No. 106) and incorporates that Motion herein by reference.

## VICTIM IMPACT & RESTITUTION

Kristopher Paul Graber was beloved by his family and friends. He was a father, son, and uncle. He often gave of his time and his talents. To be sure, he had his flaws; he sold drugs and was well-acquainted with the criminal justice system. These aspects of his life are only part of Graber's story. As documented by the victim impact statements attached to the PSIR, as well as the additional statements provided to the United States by Graber's family and closest friends, Graber deserved a chance at redemption. *See* Exhibit 2 (Impact Statements). Unfortunately, and unlike Defendant, Mr. Graber did not get that chance in his mortal life.

Graber's stepmother Joyce Purdy writes about the "two lifestyles" of her son, "Buddy."  In one of these "lifestyles, Buddy was trying to be a productive member of society and get off drugs continually, and in the other, he would get high. She explains

Buddy's family never gave up on him, praying for the day he would be a sober son and parent, but "Ms. George took this from us." Purdy explains her disappointment that Defendant claimed to have been sexually assaulted as an excuse for her actions when, in fact, Defendant "took a man's life, all for drugs and money." Graber's stepmother closes by noting she now prays for Defendant's sobriety so that she can have the chance to be a sober parent; a chance her son no longer has. Exhibit 2 at 2-3.

Rainy Graber speaks about missing her uncle "Buddy," who was the only male figure in her life. She was having a terrible year when she decided to move back home to Omak but had nowhere to stay. Her grandmother's house had only two bedrooms—Grandma's and Buddy's. When Rainy contacted Buddy, he said he would figure something out. He called back shortly thereafter, saying he was going to build Rainy a room. However, when Buddy realized the room would not be insulated and therefore cold, Buddy took the new room and gave Rainy his. When Graber spent time with Rainy, he told her he wanted out of the drug life and wanted to be the father his children deserved. As Rainy notes, Buddy will never have the chance. Rainy also speaks about the more practical side of her family's loss; Graber was the primary earner for the family, and now he is gone. In her statement, Rainy talks about Defendant too – that the Graber family really liked Defendant and how it is heartbreaking that she is now accusing Rainy's uncle of a rape Rainy knows Graber did not commit to further Defendant's own self-interest. Exhibit 2 at 4-6.

Roberta Staggs, Graber's friend and a member of the Colville Tribe, explains she met Graber in Omak, Washington, and the two dated for about seven years. Staggs and Graber were clean together for four years, but eventually Graber turned back to his addiction. She explains Graber would never rape any woman and laments that Graber is not alive today to share his side of the story, to defend himself, or to clear his name. Staggs closes by asking that Defendant be held accountable for murdering her friend, all so she could keep the money and drugs she stole from him. Exhibit 2 at 7-11.

United States' Sentencing Memorandum - 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Several close friends and intimate partners also described Graber's kindness, generosity, and how much he will be missed. Mary Pembrose describes "Buddy" as her friend of seven years, explaining that he was always kind and loving. Exhibit 2 at 17. Cassandra Vandever writes she was in a relationship with "Buddy Graber" for years. She talks about Graber's generosity and her sadness that Defendant took Graber's life. *Id.* at 16.  Chantelle Mendivil similarly was in a relationship with Graber and describes him as exceedingly generous. *Id.* at 18.  Graber would give money, food, a place to stay, or whatever the person needed. *Id.* With respect to Defendant, both Vandever and Mendivil expressed that all Graber ever did was help Defendant whenever she needed it –giving her a place to stay and food whenever she needed it. *Id.* at 16-17.  Erin Phillips adds Graber cared for Defendant and looked after her when others did not.  *Id.* at 19.

Several of the women Graber dated further expressed in their statements that Graber never touched them inappropriately or made unwanted advances toward them. Ronni Sandoval writes that Graber was not perfect, but he was always kind. Exhibit 2 at 20-21.  She also explains that she never heard anything about Graber being inappropriate with any woman, and he never made an unwanted advance or tried to force himself on Sandoval. *Id.* Similarly, Mandi Smith notes she has known Graber for years, and that he "is the furthest thing from a rapist."  *Id.* at 12-15.  She explains Buddy had been her daughter's father figure and best friend as well. *Id.* Smith adds that Buddy deserves the truth to be told. *Id.*  Lynette Washington writes she was in a relationship with Kristopher Graber for several years and was shocked by the rape allegations based on her own experiences with Graber. *Id.* at 28-29.  Washington believes this was a killing motivated by greed. *Id.*

Finally, Annie Scroggins, like many others, describes Graber's generosity and kindness to those in need. She also writes about Defendant, who Scroggins also knew. Scroggins explained that Defendant stole from men she was close to. Now "Buddy" is

gone and unable to defend himself. Exhibit 2 at pp. 22-27.[1]

After Graber passed, his family bore not only the loss of their loved one, but also the expenses related to Graber's cremation. Those costs totaled $3,995.00, including "cremation" and "autopsy repair." *See* Exhibit 3. As restitution is mandatory in this case, the Defendant should be ordered to pay this amount as restitution to Graber's family, which has not received reimbursement for these costs.

## SENTENCING CALCULATIONS

The government agrees with United States Probation that Defendant's total Offense Level is 29. *See* ECF No. 102 at ¶ 206. The government further agrees that Defendant's criminal history falls into Category III; however, as set forth in the United States' Motion for an Upward Variance and/or Departure, the United States asserts Defendant's criminal history category substantially under-represents the seriousness of her criminal history or the likelihood she will commit other crimes. *See* U.S.S.G. §4A1.3; ECF No. 106 at pp. 16-21. Defendant's Offense Level coupled with a Criminal History Category of III results in a Guideline Range of 108-135 months' incarceration.

As set forth in the United States' Motion for an Upward Variance and or Departure, a criminal history category of V is more appropriate. Again, Defendant has several violent and drug-related convictions. ECF No. 106 at 16-20. While Defendant has pled guilty to Voluntary Manslaughter, the offense conduct reflects a degree of extreme recklessness akin to second degree murder. *Id.* at 14-16. Based on the offense conduct – recklessly taking an unarmed man's life from behind a locked car door – a

---

[1] The United States did not solicit these letters from the friends of Kristopher Graber and did not inform anyone as to the allegations of sexual assault against him. Instead, friends, who read Defendant's allegations of sexual assault against Mr. Graber, who was then deceased, on the Internet and in the newspaper felt compelled to write because the allegations were inconsistent with the "Buddy" they knew, who could no longer speak for himself.

United States' Sentencing Memorandum - 6

three point upward adjustment pursuant to § 5K2.21 is appropriate. *Id.* Applying these proposed adjustments pursuant to § 4A1.3 and § 5K2.21, results in a revised guideline range of 188-235 months (Offense Level 32 and Criminal History Category V).

## SENTENCING RECCOMENDATION

In determining the appropriate sentence, this Court should consider the factors as set forth in 18 U.S.C. § 3553(a). Based on these factors, a sentence of 204 months or 17 years of imprisonment is appropriate.

1. <u>The nature and circumstances of the offense</u>

The undisputed evidence in this case is that Defendant took money, drugs, and a firearm from Graber's home on July 11, 2020, after Graber fell asleep.  ECF No. 98 at 7 (Plea Agreement).  The next day, Graber and Defendant began arguing "about the methamphetamine and cash that [Defenadant] had taken with her when she departed . . . the night before." *Id.* When she entered her guilty plea, Defendant further "acknowledge[d] the shooting was not legally justified because she exerted more force than was lawful under the circumstances." *Id.*

Although these facts are undisputed, throughout this case, the defense has sought to characterize the offense in another light – e.g., suggesting at one point that Graber gave Defendant money to keep Defendant from reporting an alleged sexual assault and asserting that Defendant was brutally raped at gunpoint. *See* ECF No. 44, Ex. 2; Exhibit 4.  Defendant's characterization of the facts, however, is not born out by the evidence. The evidence demonstrates, whatever did or did not happen on the morning before Graber was shot and killed, Defendant robbed Graber of money, drugs, and a gun. While he was asleep, she solicited a ride and then bragged to friends about the robbery/theft. The next day, when Defendant refused to give Graber his property back, Defendant shot him from behind a closed, locked door through a mostly closed window. When he was shot, Graber did not have a weapon in his hands or on his person.  Instead, Graber had just a cigarette, which he clenched in his left hand as he lay dying. Witnesses described Graber as "cool, calm, and collected." After she shot Graber,

United States' Sentencing Memorandum - 7

Defendant became frustrated with a neighbor for calling 911. She also hid the stolen drugs in a nearby field and the stolen money in her bra. When asked about the money, Defendant lied and stated she won it at a casino.

In short, this was a drug rip, and Graber's death easily could have been avoided.

      a.  <u>Defendant's Petition</u>

The United States received a petition dated October 4, 2021, regarding the case against Ms. George. The petition, alleges Defendant "has been incarcerated since July 2020 for acting in self-defense against a white man who raped her and threatened her life." *See* Exhibit 4 at 1. The Petition includes a list of approximately 6,100 signatures, but it does not contain information about how the signatures were collected. There is, however, a reference in the Petition to www.freemaddesyn.com, containing a link to "Maddesyn's Story,"[2] which appears to lay out the information conveyed to solicit these signatures. There also is a "documentary" video on this website. The video provides a similar narrative to "Maddesyn's Story," which is set forth below in its entirety:

Maddesyn's Story

Maddesyn is a 27-year-old Native woman and mother from the Colville Indian Reservation in Washington State and a survivor of domestic and sexual violence. She has been jailed for more than a year for defending herself against a white man who raped her and threatened her life. She is facing as many as seventeen years in a federal prison in California, more than 1,000 miles from her sixteen-month-old daughter, family, and community.

In July 2020, Maddesyn was raped by a white man whom she had previously considered a friend. After the rape, she took the gun he had threatened to shoot her with and fled for safety. When the man found

---

[2] https://www.freemaddesyn.com/maddesyns-story (last visited October 7, 2021). Freemaddesyn.com also contains a link to https://change.org/freemaddesyngeorge.  The Change.org site, which has a link for signing the petition, contains a very similar account as in "Maddesyn's Story."  *See* Exhibit 5 ("Summary" and "Background" set forth on Change.org, last visited October 11, 2021).

Maddesyn the next morning, the two struggled over the gun and Maddesyn fired a fatal shot. She immediately called 911. She told the police the details of the rape and of the man's threats on her life. Multiple witnesses confirmed her account of the shooting.

Maddesyn was booked into Colville Tribal Corrections and never given access to medical attention or a rape kit. The Colville Tribal Prosecutor's Office charged her with criminal homicide. Maddesyn argued that she acted in self-defense and the charges were ultimately dismissed in tribal court. However, because the shooting occurred on a reservation, federal prosecutors exercised their jurisdiction to bring new charges against Maddesyn. She has since been held without bail in the Spokane County Jail.

Maddesyn's mother has hired a criminal defense attorney and is caring for Maddesyn's infant daughter. The costs of legal representation, raising a child, jail commissary, and other related expenses are significant. Any financial help is deeply appreciated by the family.

Maddesyn now faces as many as seventeen years in federal prison. The closest federal prison for women is in California, more than 1,000 miles from her sixteen-month-old daughter, family, and community.

Maddesyn has been punished for saving her own life. Members of Missing and Murdered Indigenous Women Washington point to the prosecution as a part of a colonial legacy of gendered violence against Indigenous women. According to the National Institute of Justice (2016), more than 4 in 5 American Indian and Alaska Native people have experienced some form of violence, and more than half of American Indian and Alaska Native women have experienced sexual violence. For these survivors, criminal legal systems more often neglect or exacerbate harm rather than provide support and reparation. This is in part because reservation lands are subject to a "jurisdictional maze" that diminishes tribes' ability to hold non-Native people accountable for harms perpetuated on their lands. The federal Violence Against Women Act Reauthorization Act of 2021, if passed, will expand tribal jurisdiction in cases related to gendered violence. Washington State recently passed legislation to increase reporting and investigation of cases of missing and murdered indigenous women. However, much more is needed to end violence against Indigenous women, including support for criminalized survivors like Maddesyn.

Exhibit 6 ("Maddesyn's Story).

United States' Sentencing Memorandum - 9

The information in "Maddesyn's Story" sets forth a version of events omitting critical facts and misstating others. For example, Defendant's "Story," which first appeared online in late August 2021, does not mention that Defendant admitted guilt on July 27, 2021, stating that she was "pleading guilty because [she] was guilty." *See* ECF No. 98. Similarly, "Maddesyn's Story" breaks sharply from the evidence in this case.

To begin, "Maddesyn's Story," alleges Graber is "a white man[,] who raped her and threatened her life," and that she had to take the gun Graber "threatened to shoot her with." A video labeled, "Short Doc on Maddesyn's Story," further asserts Defendant was "brutally raped at gunpoint." None of the witnesses support these allegations. In fact, certain of these allegations are contradicted by Defendant's own account to police. In her recorded police interview, Defendant makes clear Graber did not intend to hurt her with the firearm and that he did not use the firearm as part of the assault she described. According to Defendant, Graber was "joking around" when he picked up the gun during their interaction at Graber's home that day. ECF No. 106, Ex. 11, at 13. When asked by police whether Graber pointed the gun at her, Defendant responded, "No." *Id.* Defendant explained, separate from the discussion of a firearm, Graber later grabbed a vibrator he wanted Defendant try. ECF No. 124 at ¶ 29. According to Defendant, she was not interested because she recently had a c-section and could not feel anything. *Id*. Defendant then explained in her interview, that Graber placed the vibrator against her – initially over her clothes and, when Defendant told him she couldn't feel it, he placed it under her clothes despite her telling him "no." Ultimately, according to Defendant, she convinced Graber she was hungry, and he got up to make them breakfast. ECF No. 124 at ¶ 29-30. The evidence does not support the contention Graber "threatened her life" and assaulted Defendant "at gunpoint."

"Maddesyn's Story" further states, "After the rape, she took the gun [Graber] threatened to shoot her with and fled for safety." In her statement to police, however, Defendant never stated that Graber threatened to shoot her. Rather, Defendant told

United States' Sentencing Memorandum - 10

investigators that following the incident with the vibrator, Defendant and Graber ate breakfast together, including a bagel, eggs, and bacon. After that, she and Graber were "just chilling in the room" as a couple of people stopped by the house to say, "hi."  A "maid" also came over to do laundry and dishes. ECF No. 124 at ¶ 30. Defendant did her hair, while Graber painted a mirror. When Graber later fell asleep – apparently several hours after the purported sexual assault – Defendant then took "maybe some dope" and Graber's gun and left. ECF No 106, Ex. 11; ECF No. 124 at ¶ 30.

That Defendant did not feel her safety was at risk the morning after the purported sexual assault is corroborated not only by Defendant's own statement to police, but also by witnesses who visited Graber's home that day. Alicia Meyer, who did some housekeeping for the Graber family visited that morning to clean. While Meyer was there, Defendant referred to Meyer as the "Maid."  Defendant also demanded that Meyer, whom she referred to as "Maid," get things for her – stating, e.g., "Maid, will you get me some water?"  ECF No. 112, Ex. 1 at 2 (Statement of Alicia Meyer). While visiting Graber that morning, Meyer saw Defendant and Graber cuddling, and Defendant even licked Graber's face. *Id.*; ECF No. 124 at ¶ 13. Meyer left Graber's that afternoon because she felt Defendant was being rude. *Id.* A contemporaneous text message, sent to Graber after Meyer left Graber's home, bears this out:

> **Author** Alicia MSassy (Facebook: 100052344282119)
> **Sent** 2020-07-11 21:39:11 UTC (2:39:11 p.m. PST)
> **Body** Hey your lady friend was being hella snooty at me for no reason that is why I left I'm your friend I feel not just a stupid maid

Simply put, Maddesyn's Story does not mention the breakfast, "just chilling," doing hair, painting mirrors, or that Graber fell asleep – as reflected by Defendant's Facebook messages that evening. *See* ECF No. 124 at ¶13.  In fact, according to Defendant's own Facebook messages, she began messaging various friends for a ride at about 6:00 p.m. because he was "sleeping hard." *Id.* at ¶14. Defendant emphasized, "6100 $ this is it." *Id.* When Campbell arrived, Defendant boasted she robbed Graber,

United States' Sentencing Memorandum - 11

and she was "hellaexcited" about it. *Id.* at ¶45. When Defendant was picked up by Cara Campbell, she said not one word about sexual assault; she was bragging about the $6,100 and saying, "Count it, count it," to Cody Ruiz, explaining she had taken Graber for even more money than the previous woman who had stolen from him. *See* ECF No. 124 at ¶ 45. When Defendant left, she and her friends went to a casino, where Defendant is on video with a bag consistent with the one she stole from Graber. ECF No. 106, Ex. 2. There, she puts money into the slot machines. *Id.* That same evening, Defendant was in touch with David Priest to come and get her. *Id.* at Ex. 3. Priest told her he was coming, and said, "I won't never sell u out." *Id.* This is a stark contrast from "fleeing for her safety" immediately after a sexual assault, as alleged by the petition. Additionally, there is no reference to Defendant's theft from Graber in "Maddesyn's Story" or the documentary film that appears on https://www.freemaddesyn.com.

The Petition and "Maddesyn's Story" also fail to make any reference whatsoever to Defendant's drug possession with intent to distribute (to which she pled guilty), her drug distribution the night prior to the shooting (after she left the casino, she passed drugs to Ruiz, Campbell, and Priest), or that she hid the drugs she had stolen immediately after the shooting (drugs, which subsequently were found with her fingerprints on them in the field behind the Priest house). ECF No. 124 at ¶¶ 16-17. Again, the facts relating to the 47 grams of methamphetamine are undisputed, and Defendant admitted to these facts in her plea agreement. ECF No. 98. "Maddesyn's Story," however, does not mention this evidence.

"Maddesyn's Story" further asserts that when Graber arrived at the Priest home on July 12, 2020, the "two struggled over the gun." The evidence, however, does not bear this out. Rather, as Defendant explained to police, she was behind a locked car door with the window cracked when she shot and killed Graber. ECF No. 106, Ex. 11 at 28. George said Graber was "like trying to scare me through the window," and "I got the gun off the floor . . . I had the gun, and it went off[,] and I was still in the passenger

seat." *Id.* That there was not any struggle is fully supported by the on-scene forensics and the autopsy which show the single bullet traveled through the window and into Graber's heart before lodging in his lower back (where it was recovered during the autopsy). ECF No. 124 at ¶18.  Graber died with a cigarette still in his left hand. ECF No. 106 at 9.  There was no struggle over the gun when Defendant pulled the trigger; Graber was outside of the window the bullet traveled through before piercing his heart.

The Petition and "Maddesyn's Story" further omit that Graber arrived the morning of the shooting unarmed.  He said he wasn't there to make trouble. ECF No. 124 at ¶43.  He asked Defendant to return his property or what was left of it, but Defendant refused. *Id.* Defendant confirmed this – that Graber wanted his stuff back, but she didn't give it to him – in her statement to law enforcement. ECF No. 106, Ex. 11 at 22. And, though not mentioned in the Petition or "Maddesyn's Story," several eyewitnesses, including David Priest, Martin Stanley, and Shannon Edwards, explained that when Graber asked for is property back, he was "cool," "calm," and "collected," and did not want to start anything in "D.P.'s [David Priest] mom's driveway." *See* ECF No. 124 at ¶ 43 (Stanley explained that "Graber was pissed, but calm" and stated Graber "did not want to start trouble at Mr. Priest's home"); ECF No. 106, Ex. 7 (Edwards described "Graber's demeanor []as calm" when he arrived).

"Maddesyn's Story" also never mentions that Defendant took Graber's money and drugs approximately eighteen hours before she shot him. In this regard, Graber made numerous efforts to contact Defendant to get his property back, including by reaching out directly to Defendant on the morning of the shooting.



ECF No. 106, Ex. 5.  He also attempted to contact Defendant's mother that morning, asking for help to get his money back:

United States' Sentencing Memorandum - 13

**Author** Kg ImBack (Facebook: 100050948830973)
**To:** Jody George
**Sent** 2020-07-12 18:28:03 UTC (11:28:03 a.m. PST)
**Body** Hay your maddy stole 5200 dolloers from me when I was a sleephelp me find her would you

ECF No. 106 at 7. Neither the theft, nor Graber's messages about getting his property back, are mentioned in the Petition or "Maddesyn's Story."

What is mentioned in "Maddesyn's Story" is that after Defendant "fired a fatal shot," "She immediately called 911." This is false. When Elijah LaFontaine called 911, Defendant become upset, expressing, "Oh no, what the fuck." ECF No. 124 at ¶ 39; *see also* Exhibit 16 (LaFontane 911 Call). Rather than call 911 or render aid to the man who lay dying on the ground, Defendant went to the Priest's backyard to hide drugs and other items she stole from Graber the day before. ECF No. 124 at ¶¶ 21, 22. She then called her mom. Again, none of this is in the Defendant's Petition or her "Story."

"Maddesyn's Story" also contains additional inaccuracies and misleading statements that do not pertain directly to the shooting. "Maddesyn's Story," for example, claims Defendant was never given medical attention. In actuality, Defendant was medically cleared at the jail on the day of the shooting. Exhibit 13 (Tribal Booking Records). She expressed she had no injuries, and no injuries were apparent to the booking officers. *Id.* She also affirmed she was not in need of any special care or special medical care. *Id.* On July 17, 2020, Tribal police took follow-up photos and did observe any bruising or injuries. Exhibit 14 at 3 (Det. Chronological Record). Defendant also reiterated she had no injuries, but noted her hair still was tangled from the incident. *Id.* Defendant subsequently was taken to Indian Health Services on July 30, 2020, where she underwent a pelvic exam. Exhibit 7 (Sealed Medical Record). The Exam revealed no injuries or other evidence of trauma. *Id.* Because Defendant alleged an assault with a vibrator, used by a person she was staying with, there was no DNA or similar evidence that would have been preserved. *See* ECF No. 124, at ¶¶ 26–32.

United States' Sentencing Memorandum - 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Another misleading portion of "Maddesyn's Story" is the part that says Defendant "argued that she acted in self-defense and the charges" in tribal court "were ultimately dismissed." This suggests that the Tribe would not have proceeded with the original charges. This is incorrect, the tribal charges were dismissed *without prejudice* two weeks after the federal indictment. *See* Exhibit 12 at 2.  Any suggestion tribal prosecutors did not support this case is wrong.

To be sure, some of the information in "Maddesyn's Story" is accurate. There is no question Defendant is a "domestic violence survivor," as the United States detailed extensively in its response to Defendant's Motion for a Downward Departure. ECF No. 116 at 5-7.  The domestic abuse Defendant suffered, however, was at the hands of Derek Boyd, not Kristopher Graber – the man Defendant killed on July 12, 2020. *Id.* It's also true, as "Maddesyn's Story" notes, that indigenous people are victims of violence at higher rates than members of many other groups.  Of course, to combat violence in Indian Country, the United States also has obligation to prosecute drug felonies and violent crimes.  As Defendant has admitted through her guilty plea, she unlawfully shot an unarmed person while Defendant was inside a locked car, and she then hid nearly two ounces of methamphetamine in a nearby field after the shooting. ECF No. 98.  If the United States did not prosecute cases such as this one, i.e., where an unarmed man is robbed and killed the next day, violent offenders would be emboldened, and their victims would never receive justice.

The United States is familiar with several of the non-governmental organizations that endorsed Defendant's petition and the work they do on behalf of indigenous women and domestic violence survivors. The government takes seriously the rights of these groups and calls to action from the organizations that support them. In this case, however, those who signed the petition did not have all the evidence known to the United States and Defendant. Based on the actual evidence, U.S. Probation has now recommended an upward departure or variance in this case:

United States' Sentencing Memorandum - 15

> The guideline range appears to be insufficient to protect the public from further crimes of the defendant, to afford adequate deterrence to criminal conduct, and to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment based on the defendant's conduct in this case as well as the nature of her criminal history.

ECF No. 124 at ¶239. If those who signed the petition had a more complete picture of the evidence, many of those who signed may have elected not to do so.

In sum, the information, as supplied in "Maddesyn's Story" and the related video diverges dramatically from the actual evidence in this case. This narrative also departs significantly from the events relayed by Defendant herself. The Petition, endorsed by well-meaning people, is premised on misleading information and misstatements of fact. The petition also does not account for the impact of Graber's death on his family and friends. The Petition should not weigh heavily in this Court's sentencing decision.

   b. <u>Defendant's Account to Law Enforcement</u>

In the Defendant's sentencing materials, Defendant asks this Court to rely – almost to the exclusion of any other evidence – on "the audio recording of Maddesyn George's interview with the police" in which she describes being assaulted.  ECF No. 117. While the United States agrees that the Court should consider Defendant's statement, the Court also should evaluate the other evidence in this case. Defendant's statement cannot be viewed in a vacuum as Defendant suggests.[3] Here, witness statements, forensic evidence, the parties' plea agreement, Defendant's Facebook messages, and Graber's calls and messages to get his money back, must all be

---

[3] As detailed in the United States' Opposition to the Motion for a Downward Departure, Defendant has an admitted history of providing false information to law enforcement.  *See* ECF No. 116 at 5-7; *see also* ECF No. 106 at 19 ln. 3-8 (describing false statements Defendant made to law enforcement when she was arrested for possessing drugs). On one occasion, Defendant stated to an officer that "she had a habit of lying to police officers."  Exhibit 17 (Okanogan County Police Report).

United States' Sentencing Memorandum - 16

considered. *See* ECF No. 106 at 2-12. That evidence overwhelmingly demonstrates that Defendant stole from Graber and shot him when he tried to get his property back.

    2.  <u>History and characteristics of Defendant</u>

    Defendant's history is concerning. Defendant's convictions are well documented in the PSIR and the United States' Motion for an Upward Variance. ECF No. 124 at ¶¶ 74 – 165; ECF No. 106 at 16-20.  Additionally, her history of arrests for various violent crimes demonstrates the risk that Defendant would recidivate. *See id.*

    Defendant has a history of violent crime. She was convicted of fourth degree assault when she assaulted her mother, Jody George, while Jody was attempting to get Defendant away from her abusive boyfriend, Derrek Boyd. ECF No. 124 at ¶ 86. Defendant kicked and punched her mother. *Id.* Defendant was convicted of another fourth-degree assault when, on July 17, 2010, George "pulled [J.C.] from her vehicle and beat" J.C. At this point, a male with Defendant kicked J.C. in the head several times. *Id.* at ¶ 96. A third fourth-degree assault conviction stemmed from events on August 22, 2010, when "J.L. advised she was in a vehicle when [Defendant] opened her door and punched her in the face at least 3 times, trying to pull her from the vehicle by her hair." *Id.* at ¶ 99. Defendant was apprehended when fleeing from police. *Id.*

    Defendant's assault on Kendra McCoy on July 2, 2021, just 10 days before Defendant killed Graber, is particularly concerning. *See* ECF No. 124, ¶¶ 157-160. McCoy reported to law enforcement, and later testified under oath that Defendant and her boyfriend, Cody Ruiz (identified by McCoy by his nickname, "LowDog") attempted to steal McCoy's car and doused McCoy with lighter fluid. *Id.* When local officers responded to the scene, McCoy was distraught and explained that Defendant threatened to kill McCoy. *Id.* Officers also observed that the scene smelled of lighter fluid, consistent with McCoy's statement that she was doused. *Id.* Notably, Tribal Police found McCoy's identification card, her social security card, and her Medicaid card inside the bag containing drugs that Defendant hid after shooting Graber.  *See* Exhibit 15 (photo of items recovered from Defendant's backpack).  In a text message,

United States' Sentencing Memorandum - 17

two days after McCoy reported Defendant's threat to light her on fire, Ruiz (a.k.a., LowDog) messaged Defendant about lighting people on fire:

> **Author** Cody Ruiz (Facebook: 100016235580170)
> **Sent** 2020-07-05 18:26:42 UTC
> **Body** If u anit to mad at an u promise not to set a mothafukka on fire I wanna link up explain then kiss ur ass a lil bit an hopefully ur forgive me

Defendant also has a history of drug distribution. She received one such conviction as a minor. ECF No. 102 at ¶ 89. Then, as an adult, on January 3, 2017, she received a felony conviction, in the Superior Court of Washington, County of Okanogan, for Conspiracy to Deliver Methamphetamine. ECF No. 102 at ¶ 110. In that case, a confidential informant (CI) provided prerecorded buy money to Defendant and received methamphetamine in return. ECF No. 124 at ¶ 113. Defendant also discussed a future drug transaction that was to take place after the CI's purchase. *Id.* Five months later, Defendant was arrested and convicted for trespassing – while possessing additional methamphetamine. ECF No. 124 at ¶ 124. Defendant was subsequently convicted of another drug felony when, on April 7, 2018, a search warrant was executed, and Defendant was detained. ECF No. 124 at ¶ 145. Pursuant to the search, methamphetamine was located on a table and on top of a black Sentry safe; methamphetamine was also located in quart size baggies on top of a pellet stove and in a glass pipe next to Defendant's purse. *Id.* In fact, Defendant was still on community supervision for that drug offense when she committed the offenses to which she has now pled guilty. Defendant also has a 2014 tribal conviction for possession of a controlled substance where she had methamphetamine, small baggies, $1,485, and a scale at the tribal casino. She was sentenced to 360 days in jail with 240 days suspended. ECF No. 124, ¶¶ 148-148f.

Defendant's long history of drug distribution on the Colville Reservation and in the Omak area, is born out not only by her convictions but also by numerous Facebook conversations in which Defendant is advertising and/or arranging to sell drugs. During the investigation, Defendant was implicated in the distribution of methamphetamine

United States' Sentencing Memorandum - 18

1  ("clear") and heroin ("dark") on or around the Colville Reservation to at least 30

2  different people since March 2019.  Examples of Defendant's drug distribution via

3  Facebook Messenger are set forth in Exhibit 8.  Below are examples of messages in

4  which Defendant makes reference to distributing drugs as well as firearms:



Exhibit 8 at 24.

*Id.* at 22.  Additionally, in June 2020, James Gallaher, who has a previous conviction

for manslaughter, reached out to Defendant to obtain a firearm.  Gallaher also

communicated with Defendant about obtaining drugs, as set forth below:

In several of Defendant's jail calls after she was charged in this case, Defendant

further demonstrates a level of immaturity and a lack of remorse for taking Graber's

United States' Sentencing Memorandum - 19

property and life – joking with friends and laughing when a friend coins a new verb – to "fuck around and get 'Buddied,'" referring to someone who was shot and killed. Exhibit 9 at 14:00 – 18:14 (Sept. 4, 2020 call). Similarly, at one point after her arrest, Defendant began laughing when she learned, as Defendant put it, "some bitch rolled" Defendant's friend, Joseph Moses, taking $700 after Moses "passed out," as had been done to Graber.  Exhibit 10 at 1:45 – 3:15 (Mar. 1, 2021 call).  Defendant expressed that Moses "probably earned it," and the incident was "hellafunny." *Id.*  In another call, shortly after she was arrested, Defendant jokes about the seriousness of Graber's death saying, "It was for a good cause."  Exhibit 11 at 0:25–1:30 (July 21, 2020 call). When her father responded that Defendant needs to remember that the calls are recorded, Defendant states that she "felt so bad," wishes she could take it back, and indicates that she would probably go to hell for what happened. *Id.*

3. <u>The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, to provide just punishment, deter criminal conduct, and avoid sentencing disparities.</u>

 A person who possesses over five grams of pure (actual) methamphetamine, with intent to distribute, as Defendant pled guilty to, faces a mandatory minimum sentence of five years. 21 U.S.C. § 841(b)(1)(B)(viii). A person who discharges a firearm in furtherance of narcotics trafficking, as Defendant did, typically faces a mandatory ten years, consecutive to the drug trafficking offense. 18 U.S.C. § 924(c). Defendant's actions, i.e., drug trafficking with a firearm – a firearm she ultimately discharged – are so serious that Congress deemed a mandatory minimum of fifteen years' imprisonment was appropriate for those crimes. In this case, the crime is far more serious still – when Defendant discharged the firearm, a father, son, uncle, and friend was killed.

 In terms of respect for the law, Defendant has little to none, and her actions demonstrate a significant sentence is necessary to deter her from future criminal conduct. Defendant has made a habit of committing violent assaults, drug trafficking,

United States' Sentencing Memorandum - 20

and lying to the police about these crimes. She had three felony convictions prior to July 11, 2020, when she took the firearm involved in the shooting. Her felony drug convictions have done little to stem the tide of her drug distribution, which is most readily demonstrated by the fact that Defendant was still on community supervision for a drug offense when she stole Graber's drugs, shot him after he asked for the drugs back, and then ran and hid the drugs while he lay dying. These actions show Defendant will not be easily deterred from years of drug distribution.

As this Court evaluates what will provide just punishment, as is noted herein, people similarly situated to Defendant who do not kill anyone or even shoot anyone for that matter are subject to a fifteen-year mandatory minimum sentence. 21 U.S.C. § 841(b)(1)(B)(viii); 18 U.S.C. § 924(c). There is no circumstance under which a sentence to less than that – when she also took a life – can be considered just. Similarly, in considering potential sentencing disparities, the Court should consider the evidence that Defendant showed extreme recklessness by picking up a loaded firearm off the floorboard, pointing it at an unarmed victim, and firing it from inside a locked car. Accordingly, the appropriate consideration is not just the guideline for voluntary manslaughter, but also the seriousness of Defendant's offense conduct – i.e., recklessly killing Kristopher Paul Graber. *See United States v. Brave Bull*, 828 F.3d 735, 740 (8th Cir. 2016) (affirming an upward departure where defendant pled to voluntary manslaughter and assault with a dangerous weapon because evidence demonstrated that defendant was aware of a serious risk of death to victim).

In short, the United States has sought a resolution and sentence in this case that takes into account both the mitigating and aggravating circumstances in this case. Defendant killed Kristopher Paul Graber, who was unarmed at the time, without justification and provocation. Although she was high and scared when she pulled the trigger, Defendant unjustifiably took Mr. Graber's life. When compared with sentences

for similar offenders convicted of violent offenses, the government's recommendation is fair and reasonable. Seventeen years is the appropriate sentence.

## CONCLUSION

Based on the foregoing, the United States asks this Court to impose a sentence of 204 months' incarceration and a lifetime term of supervised release. This sentence accounts for mitigating factors such as the domestic abuse previously perpetrated against Defendant, but also reflects the seriousness of the offense and would give some measure of justice to the Graber family. On November 2, 2021, Defendant will have served 478 days in jail.  With good time of 54 days per year, if the Court imposes the 17-year sentence recommended by the United States, she will have 4,809 days (or 13.2 years) left to serve, which would make Defendant just beyond her forty-first birthday when released from confinement.  She would still be a young woman with plenty of life in front of her.  The sentence is not short; as Defendant's crime was terribly serious. However, neither is it so long that Defendant cannot still make a meaningful and productive life for herself.  This sentence also provides Defendant with an opportunity for redemption – an opportunity that Kristopher Paul Graber will never receive.

DATED: October 13, 2021

Vanessa R. Waldref
United States Attorney

*s/Alison L. Gregoire*
Alison L. Gregoire
Assistant United States Attorney

*s/ Richard R. Barker*
Richard R. Barker
Assistant United States Attorney

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to Counsel of Record.

> *s/ Richard R. Barker*
> Richard R. Barker
> Assistant United States Attorney

United States' Sentencing Memorandum - 23